Good morning, Your Honor. Hello, Judge Hugg. Nancy Tompkins with Councilman Townsend and crew, representing the petitioner Elena Saldivar. This case presents three questions. Whether Attorney Martín Reséndiz Guajardo provided Elena Saldivar ineffective assistance of counsel after the Department of Homeland Security initiated removal proceedings against her in 2000, whether Mrs. Saldivar was possibly prejudiced by Mr. Guajardo's performance, and whether this Court can do anything about it. We have argued that Mr. Guajardo was ineffective as Mrs. Saldivar's lawyer in two significant ways. First, by advising her to marry the father of her three children, an undocumented Mexican national, in 2001. And second, by failing at her cancellation of removal hearing to present any evidence regarding the hardships her three minor United States citizen children would face upon her removal from the country. The government doesn't even try to argue that Guajardo's advice to marry was competent, let alone strategic, as the BIA determined. And so as to prejudice, there can be no doubt. The consequence of Elena Saldivar's marriage was to disqualify her for the visa her father had petitioned for her 13 years earlier in 1988. But that doesn't play into the decisions the BIA and the immigration judge were making, does it? Yes, we raised that argument on remand, or rather in the motion to reopen, Your Honor. And the BIA said that that was strategic advice on Mr. Guajardo's part, that she should marry. I understand they said that, but isn't it also quite irrelevant to the immigration proceedings that were underway? I don't think so, Your Honor. The right to effective assistance attaches as soon as the notice to appear issues from the agency. The agency sent her a notice to appear in July 2000. She sought Mr. Guajardo's counsel in March 2001, almost a year later, specifically with respect to the notice to appear. She said, what am I going to do about this? Will you represent me in these proceedings? Guajardo, without asking her any questions whether she had any other way of entering the country legally, without looking at her immigration file, which was readily available to him through the Freedom of Information Act, quite glibly said, the best thing you could do right now is get married. She had been refraining from marrying consciously for fully a decade, though she'd been living with the father of her three children. They'd already had their children, who were U.S. citizens. And on her father's advice, she knew not to get married up until then. And now she's speaking to a lawyer who says, you've got to get married. It appears that what Mr. Guajardo was really after, because he later said to them, boy, that was really stupid of me to have told you to do that. It appears that what Mr. Guajardo thought was he could ask her for more money if he told her that he could get her husband in at the same time as he won her right to remain in the country. So I think that that act of ineffectiveness is definitely cognizable in this proceeding. And if it is, what remedy do we have? It's fairly standard. The other remedy that you're asking for, which is to say, grant the motion to be open, require that there actually be a counseled good hearing with respect to hardship and so on. That fits into a category we all understand. Yes. How does this, actually in a sense more serious, ineffective assistance of counsel, if that's what we're going to call it, fit into a scheme under which this Court is able to provide relief? I understand, Your Honor, that this Court operates under constraints. And I really did rack my brains. I have yet to see a case where this Court has said, this was ineffective assistance. It was highly prejudicial. We can't do anything about it. In fact, the government – I'm a little hampered in defending this remedy because the government didn't, in fact, assail this particular remedy in its answering brief. The government – I proposed two different remedies in the opening brief. The government only attacked one of them. The government says, though, that what the government says in saying what cannot be done, the government says on page 23 of its answering brief, says, Ms. Saldivar does not merely ask this Court to apply a retroactive date of application for relief to which she has demonstrated prima facie eligibility, as in Castillo-Perez, but rather to take a further step of doing something else. But this is, in fact, exactly what Mrs. Saldivar is asking. She's asking the Court to apply a retroactive date of application for relief to which she has demonstrated prima facie eligibility. There's ample precedent in the immigration regulations, which I've cited to the Court, for when a certain – when the same Petitioner has sought benefits for the same beneficiary and there's some change in circumstances for either the Petitioner or the beneficiary for the – to transfer the – it's called recapturing the priority date, but to apply the date of the original petition to the later petition. In this situation, her father filed a petition which was approved for her in 1988. Her father has now become a naturalized citizen in 2006, and he filed a new petition for her, his same daughter. United States citizens, unlike LPRs, can bring their married children into the country. But if she's made to – to wait in the line for the petition filed in 2006, she's looking at 15 or 20 years. Here's an idea. The BIA, in denying the motion to reopen, basically does it in two paragraphs. The first paragraph refers to this why-don't-you-get-married legal advice and calls it a strategic decision and says that unless there's a showing that this was egregious, we can't do anything about it. Well, what if we were to conclude that it was not what can fairly be called strategic? Strategic usually means there's a sufficiently rational basis for it that a competent lawyer could have done it. And rather than being strategic, it was egregious. And we say, well, okay, that bound for refusing to reopen is not valid, and remanded the board saying you need to reopen and invite the board to see what remedy it might be able to come up with. I'm afraid I don't see that this court would have the power to order that she be given her place back in line all by itself. Okay. I understand, Your Honor. I mean, would that work? I like it. And the government's listening. So, I mean, this is probably a question to you. Is that a feasible thing or an appropriate thing to do as a basis for a remand? Yeah. I like it, Your Honor. Obviously, you're much more, have a better feel for the limitations of this body, of the Ninth Circuit, than I do. Would you please tell that to the Supreme Court? I'll write him a letter. May I continue? Please. I'm sorry. I should keep my sarcastic remarks to myself. Not at all. Not at all. So, turning to weather, Mr. Guajardo did an adequate job of presenting Saldivar's case for cancellation to the IJ. He did not. With the most promising avenue of relief foreclosed to her, Mr. Guajardo's job was to show that Mrs. Saldivar's removal to Mexico would cause an exceptional and extremely unusual hardship to her three young children. Guajardo presented no evidence to meet this daunting and fact-specific standard. The witnesses Saldivar herself had lined up and the declarations and psychological reports she herself had compiled were all excluded because he failed to disclose them in advance of Saldivar's hearing date. Because Saldivar was never informed that the showing she was supposed to make had to do with her children, much of that excluded evidence would not likely have helped her. But some of it does explain the role she plays in her children's lives. Her sister wrote in a declaration that Elena is a wonderful mom who always has time to take her kids to activities and go to school. Her younger daughter, Stephanie, who was interviewed by a psychologist at age six, said that she began to have bad dreams when her mother told her she might have to go away. And her older daughter, Michelle, interviewed at age 10, said that without her mother, the family would not be the same because her mother makes the family stick together. Michelle also stated that her mother ensures that she does her homework, eats well, and sleeps on time. She said what she likes best about her mother is that she helps her a lot with her homework and gives her food. Michelle also stated that her saddest memory was of her mother leaving to spend a month in Chicago with her ailing father when Michelle was seven or eight years old. She said that when her mother was away, she ate poorly and she had bad dreams of never seeing her again. These facts suggest the showing that Guajardo might have made, that Elena Saldivar's own children regard her as critical to their practical and emotional well-being. Since the BIA and this court has repeatedly held that family separation warrants careful scrutiny, these facts could have made a difference. Other pivotal facts were not presented because Guajardo had not taken the time to prepare his client or to learn anything in particular about her children. In fact, he had no idea who would take care of them in their mother's absence, and neither did Mrs. Saldivar. He put her on the stand without ever having informed her that the IJ would expect to hear what she planned to do with the children if she was made to leave the country. Saldivar had no answer to this question when the IJ asked her. What Guajardo did know is one of the facts that makes this case exceptional and extremely unusual, the fact that but for his incompetence, the Saldivar children would not be facing the loss of their mother at all. He couldn't afford to reveal this fact because Guajardo is an attorney who is skating on very thin ice. I take it this Court is well aware. He's been criticized many times. He was suspended and he was almost disbarred by this Court in 1991 for his habitual professional negligence. He's currently the subject of an ongoing disciplinary inquisition in this Court right now, and he has a 69-page discipline record with the California State Bar. The truth is that as soon as Saldivar took Guajardo's bad advice to Mary, a conflict of interest arose that should have prevented him from representing her in these proceedings, because the fact that Guajardo least wanted to come to light was the fact that the IJ most needed to know to appreciate just how exceptional and unusual the facts of this case are. The fact that the only reason Saldivar does not have a green card today is because her attorney made a disastrous and inexcusable mistake. Since Saldivar's hearing in 2003, additional facts have arisen which also illuminate her children's hardship. Michelle, Saldivar's oldest daughter, a straight-A student, has been awarded the scholarship to private school. At the same time, her mother has begun preparing her to take over her role in the family, cooking and taking care of her younger sibling. It doesn't seem possible that Michelle, who reported three years ago that her mother helps her a lot with her schoolwork and also gives her food, would be able to continue on her current academic trajectory if she were suddenly not only deprived of her mother's support, but also expected to fill her shoes. The government asserts that none of this evidence could possibly have affected the outcome of this case, but as the IJ said, all relevant factors, though not exceptional or extremely unusual when considered alone, must be considered in the aggregate in determining whether exceptional and extremely unusual hardship exists. It is very plausible that this evidence, had it been presented, could have changed the outcome of this case. It certainly cannot be as obvious as it seems to the government that an outcome based on no evidence could not possibly be altered by the presentation of some evidence. As to Guajardo's failure to admit his original sin of having advised Saldivar to marry, this omission certainly appears to have influenced the IJ. The record reflects that the IJ was baffled as to how it came about that all of Saldivar's siblings, younger and older, eventually achieved legal status in this country, and she did not. He asked Mr. Guajardo about her father's 1991 petition. Has it been approved? When was it approved? And what's the priority date now? That's in the record at page 394. And he evidently understood that Saldivar's marriage played a role in the loss of that petition. At the hearing, when Saldivar mentioned that one of her younger brothers, who got his papers through their father's petition, the IJ asked, and that's when she was already married. Is that right, Mr. Guajardo? You know, you're running over, or rather you have run over. Why don't you sum up here very quickly, and then we'll give you one minute to respond. I'm sorry. Could I ask a sort of a cleanup question before we go to that? If we are persuaded that there was incompetence here, if we are persuaded that there could have been prejudice here, I have a concern that the agency considered these things, and I'm troubled for whether or not we have a case where their decision is either without substantial evidence or arbitrary or capricious, because I think that's what we have to find in order to remand, even if we're persuaded that if we were making the decision in the first instance, we'd say this guy was incompetent and there was possible prejudice. I understand. Well, as to the BIA's conclusion that Guajardo's original sin was strategic, that simply flies in the face of a whole lot of Ninth Circuit law, which has a strategy, a strategic decision has to advance some discernible strategy. There has to be something good that might have come from this advice. There was nothing good that could possibly have come from his advice to Mary. So that was you abuse discretion when you fail to apply relevant law or when you misapply relevant law. So that certainly was an abuse of discretion there. The BIA, as to this question that I'm discussing now, whether Guajardo should have confessed his incompetence, whether that might have colored the IJ's understanding of this case, whether Guajardo should have confessed to the IJ that he himself had advised Saldivar to Mary, the BIA simply ignored that question. The BIA said nothing about that in denying the motion to remand. And the BIA doesn't have the discretion to do that either. There's a whole bunch of Ninth Circuit law that also says the BIA has to explain its decision, basically. And the BIA didn't explain this part of its decision at all. It appears that it simply disregarded this part of the argument. This is a version of, or a follow-on from Judge Holland's question. You answered it in substantial part. And part of your answer was, well, the IJ might have come to a different decision in weighing the hardships and deciding whether to grant relief from removal if the advice of the lawyer had been in advising marriage. Well, that might be because we're quite familiar with adjudicators who are swayed in close cases by things that are not strictly relevant as a legal matter. Can you tell me, however, how that knowledge as to how bad the lawyer's advice had been would be legally relevant to the question of hardship? I think it does compound the hardship in this case, Your Honor, for a few reasons. First of all, this is a family. It's quite except — well, first of all, I should say that the standard isn't, is this hardship harder? The standard is, is this hardship exceptional and extremely unusual? And this is about as unusual a case as I've ever seen. Two things that I can think of immediately that make it unusual is, well, this never should have happened. This — these children, contrary to what the IJ said, they were not born in the face of the clear and present danger that they would one day — that their mother would one day be removed from the country. And this family — I see. So that actually does change an explicit conclusion by the IJ. Exactly. That's my — the IJ said repeatedly in his decision that it — it was very clear that he was assuring himself, assuring the BIA, and assuring this Court that Elena Salovar had assumed the risk that she would one day be separated from her children. He said in his opinion that she had these children in the face of the clear and present danger that she would be kicked out of the country. She did not. He said, therefore, that she must take some responsibility for their sad fate. So it's very clear from the record that she did not. I think — Why don't we hear from the government? I apologize for having taken you over. I'm sorry for having rambled. But I was loud, wasn't I? You were perfectly loud. Good morning. Good morning again, Your Honors. Song Park for the Attorney General. And make sure to speak into the microphone so that Judge Hudd may hear. Judge Hudd, can you hear me? Yes. Great. Thank you. May it please the Court, I think Your Honors hit the nail on the head with respect to the advice that was given regarding Petitioner's marriage to her husband. One, that that is an issue that is outside of the proceedings. The advice that she received about getting married, thereby affecting her visa petition. Well, why is it outside the proceedings? It's the very first paragraph of the BIA decision that we're reviewing. Right. That's correct, Your Honor. And it's a real paragraph. It's not just a little one-liner. Right. It's a full paragraph. But the advice that she received with respect to her visa petition, with respect to her visa and her eventual potential adjustment, is that that is a determination solely, that applies solely to her visa petition proceedings before the Department of Homeland Security. It didn't really have an effect on the removal proceedings before the immigration judge, even though. Well, I just heard, in fact, I remember having read it, that the IJ says, listen, you shouldn't have done this knowing that you were at some substantial risk for being deported. That's correct. But he didn't, the IJ didn't understand the risk that actually was in existence, which was moderately low until this lawyer gets involved. Well, to address that issue first, one, just because there's a visa petition that's been approved and you have that pending, that doesn't give you any greater right or entitlement to expect to remain in the United States. And the Petitioner's reply brief does concede that. They recognize just because you have a visa petition does not give you any greater right or entitlement to remain in the United States. Second, if the context of this bad advice, and the government recognized this was extremely bad advice that was given by Mr. Guajardo to this Petitioner. Would you call it egregiously bad advice? It was very bad advice that was given by Mr. Guajardo. Can you imagine in the circumstances any worse advice? It's always possible. It could always get worse. You know, we've been around immigration law long enough to know, yes, it is possible to be even worse than this. Although you'd have to work pretty hard to be worse. It was bad advice here. But if Mr. Guajardo had, if Petitioner in this case had come to see Mr. Guajardo a year, a month even before her notice to appear had been issued to her, and Mr. Guajardo gave her the same advice that she should go ahead and get married to this guy because it would improve her chances of remaining in the United States, it would be clear at that point that there's no government action in that decision between Mr. Guajardo and the Petitioner, and it would remain, that decision would affect only the visa petition that was proceeding before the Department of Homeland Security. That doesn't change merely because that scenario arose after the notice to appear had been issued to Petitioner. That was, the fact that she is no longer eligible for this form of being able to adjust is something that only relates to the visa petition proceedings before the Department of Homeland Security. And so with respect to any prejudice or any ineffective assistance that she may be asserting in this case to her marriage, to her decision to get married, that has no bearing, as Your Honors may have noted earlier, with respect to her claim that any sort of ineffective assistance or due process violations arose during the course of her removal proceedings. And, in fact, even if I know earlier Petitioner's counsel had alluded to various forms of relief that may still be available to her with regard to adjusting, but the fact is that once Ms. Saldivar married her husband, it irrevocably and permanently changed her status before the Department of Homeland Security in the manner in which she could obtain her adjustment. There is no provision in the INA that allows her, as a married child of a lawful permanent resident, to be able to adjust her status. That provision simply was not provided for by Congress. And so to give her the remedy with respect to her adjustment application of being able to adjust or to go back to a place in line so that she could adjust her status as an LPR, as a daughter, unmarried daughter in LPR, is simply not a remedy that is available to either this Court or even the Board to be able to grant. You know, if she had had good legal advice, or maybe I'll even say it this way, if she had had no legal advice and simply had done what her father told her to do, she would almost certainly be legal today. It seems likely. It seems likely. But that doesn't necessarily entitle her or to give her any greater rights of expecting to be able to remain in the United States. And it's well known that we have a very serious problem, not limited to this lawyer, of catastrophically bad lawyers in this field. We try hard to educate lawyers in this field. We try hard to discipline them and, in some cases, to eventually take them out of the practice. The BIA occasionally, and we'll see this in the next case, will disbar them from practice in front of the IJs and in front of the BIA. But it's pretty pathetic the degree to which these people remain in practice. I don't think anyone can look at this sequence of events and say that the system worked properly or even fairly with respect to her. Would the government be willing to take advantage of our mediation services in this case? I can't give you a response, Your Honor, without first having spoken with our client agency. It's always a possibility. I'd be happy to check with them and get back to the court about that. I think it is important to realize, though, there is, even if the remedy that she is asking for before this court, that is to be able to be given a status where she can adjust again, even though that's not something that she can be granted by this court and she certainly can't get that from the board, she does have other means of remedy. She can certainly bring suit against Mr. Guajardo. And he can give her a visa? He can't give her the visa, Your Honor. But at the same time, it would be unfair to impugn his bad conduct to the government when, in fact, the government played no role in the decision or the conversation that occurred between Mr. Guajardo and Ms. Salvador that eventually led to her deciding to get married. No, I can't blame the government for his bad advice. I mean, you're clearly right on that point. You know, I've got another question, which is in a way off to one side of the case itself. On pages 31 to 35 of your brief, you argue that there should be no claim for ineffective assistance of counsel basically in immigration proceedings. How high up in your department did that four-page section of your brief go? I mean, is this your position or is this the Attorney General's position? Who's writing that to us? This is the Attorney General's position, Your Honor, because I believe that same argument has been made in various forms. It may be in the form of a footnote. It may be in the form of a full address, as it is in our brief in this particular case. But I do know it's a point that's been made several different – on different occasions in various different cases to this Court. And it's specifically because, as this Court has recognized, an immigration proceeding is a civil proceeding, and there is no expectation or requirement on the part of the government to provide counsel to litigants. They have the ability to be able to – they have the privilege or the ability to go – retain one on their own. But the fact that they might have gotten bad counsel as a result of that privately retained attorney should not be something that's impugned to the government because they simply were not required to provide that counsel. But you recognize, I think, that you're asking for a change in existing law? With respect to this circuit, I believe so, yes. Are there any other circuits that say what you just said? There are several cases that were issued in the Seventh Circuit, which is cited in the Respondent's brief, that indicate that if there has been some kind of bad advice given by privately retained counsel to Petitioner and Petitioner suffers some sort of harm from it, that their course of remedy is not to seek redress from the government, but in fact to bring private suit against that particular bad counsel. But I'm not sure that was quite my question. Has the Seventh Circuit, which is the circuit you just mentioned, held that there is no ineffective assistance of counsel right in immigration proceedings? Not quite that broadly, no, Your Honor. Okay. What if under California law, she were able to get the marriage annulled? I think Petitioner's brief addresses what would happen if she were to take a sort of a different change her status with regard to her marriage. Of course, I don't want to speculate as to how the government might treat her application at that point. There are certain provisions in the INA regarding how an application may be viewed if certain steps are taken in order to avoid other provisions of the INA. So I'm not sure that I have an express answer I can give you, Your Honor, but there are provisions in the INA that prohibit an alien or an applicant from behaving in a certain manner or to bypass or step around other provisions that are provided. Well, the reason I'm asking that is if this matter were to proceed to mediation, and it's clear that the sole reason for the marrying was as a result of incompetent legal advice, there may be a basis for annulling under California law, and this may be different than something that where there had just been a ruse to get around the immigration law. Here, under immigration law, she was entitled to the visa, but the ruse wasn't there. It was really the bad advice of counsel. I'm just speculating as to whether that would be something could be considered. It might be something that the government would consider in mediation, but, again, it's very important to point out, it would be not because the government believes that any error or any bad advice by Mr. Guajardo should be impugned to the government, because in this case ---- No, it was certainly not the government's fault. I agree with that. Correct, Your Honor. But, again, I can check with our client and see what their position would be with regard to mediation. How long would it take you? And I don't ---- I'm not trying to press you with an accelerated deadline. I'm just trying to get a reasonable sense. How long would it take you to determine whether the government would willingly submit to mediation? It probably wouldn't take that long, maybe a week, Your Honor. Why don't we give you 21 days? Because you may be a little optimistic as to how fast the wheels are going to turn here, subject to extension. But if within 21 days you could tell us whether or not the government would willingly take this case to mediation, that would be useful to us. We, of course, have the power to order you to mediation, but that usually doesn't work very well if one party goes kicking and screaming. And the government may wish to consider, as it's deciding whether willingly to go to mediation, as to whether or not it's going to like the law we're going to make if we decide this case on the merits. I think, though, before, I do want to point out that, again, with respect to her adjustment request, there is no statutory provision that allows her to be able to adjust her status in her current marital because of the fact that she is currently married. She's a married daughter of an LPR, and the government would like to point out that there's no INA provision that allows her to be able to have any basis of adjusting based on her current marital status. And I know I'm out of time, Your Honors, but I just do want to very quickly point out, with respect to the second half of this case, which is the cancellation application that was denied, one, as we argue in our brief, that there's no liberty interest that's associated with the cancellation, which is a purely discretionary form of relief. So, again, there would be no due process claim that can arise out of a discretionary form of relief, and in any event, that both the BIA as well as the IJ gave sufficient review of the evidence that was submitted in concluding there was no not sufficient hardship in this matter, Your Honor. And there's nothing to dispute the fact that the findings of the agency with respect to the fact that there was no health issues, no educational or special needs issues regarding these children, and that they do speak or understand some Spanish, all of those are supported by the record and brought up, in fact, by Mr. Guajardo's questioning. Thank you, Your Honors. Thank you. Thank you very much. Response? Yes. We'll give you a minute. First, just to be perfectly clear, her immigration status is now that she is the daughter of a United States citizen. Her father is no longer an LPR. I'm just correcting what she just said. And I'm just going to give you some CAFO to help you. It's very clear that the right to effective assistance attaches in an immigration case as soon as a notice to appear issues. You can — a case I'll cite to you is Lara Torres v. Ashcroft. That's 383 F. 3rd, 968. So it's absolutely clear. In this case, the notice to appear was sent to her a year later. She sought his advice in regard to the notice to appear. This was his advice to advance her cause in this proceeding. I also want to direct the Court's attention to United States v. Kwan. This is a case that we cited in both our opening and reply briefs, which I think is illuminating here. Kwan was a case where an alien was subject to criminal charges, and he sought the advice of a criminal attorney who urged him to plead guilty. The defendant said, I'm worried if I plead guilty that I might get deported. The attorney said, don't worry about it. There's lots of things we can do if you're ordered deported. And as soon as he pleaded guilty and served his time, the Bureau did begin to initiate deportation proceedings against him. This Court, though similar to in this case, those consequences were collateral, really. Deportation was collateral. It was immigration. Okay, Your Honor. I think you're well familiar with that case. Thank you very much. Roberts. Thank you. Thank you both sides for your argument on this. I'll call it a difficult case. And I'm primarily meaning difficult facts. This is not a case that anybody's happy with. I'm sure that's true for the government as well. Okay. Saldivar v. Gonzales is now submitted for decision. The next case on the calendar is Lopez Rizzo v. Gonzales. Thank you.
judges: Hug, W. Fletcher, Holland